ISAAC VS UNITED STATES.

Opinion rendered September 26, 1907.

(104 S. W. Rep. 588).

1. *Witnesses—Cross Examination.*
    The fact that a witness is directly interested in a suit may be shown on cross-examination, and the opposite party may ask the witness any thing that will show his interest or aid he has given the party. in whose behalf he testifies.

2. *Same—*
    An examination of a witness by the court in a criminal prosecution was held not to be a violation of the rule that, where a witness testifies to a fact positively the court should not cross-question him at length in regard to his knowledge of the fact he testifies to.

3. *Criminal Law—Credibility of Witnesses.*
    The court rightly explained to the jury that a prosecution for perjury could not be based on an affidavit made by a witness and introduced

in evidence in a criminal prosecution, because the law did not require that the statement be sworn to.

4. *Same—Counsel's Remarks.*

The prosecuting attorney may comment on the facts and circumstances brought out by the evidence.

Error to the United States Court for the Western District of the Indian Territory; before Justice Wm. R. Lawrence, May 19, 1906.

S. W. Isaac was convicted of crime, and brings error. Affirmed.

On the 8th day of March, 1905, in the United States Court for the Western District of Indian Territory, sitting at Wagoner, the grand jury presented in open court an indictment for false pretense against plaintiff in error. Said indictment charged that one S. W. Isaac on the 15th day of August, 1904, did unlawfully, feloniously, and designedly, with the intent to defraud one Emma Canady, nee Craig, falsely represent and pretend to her, the said Emma Canady, nee Craig, that a certain written instrument which he, the said S. W. Isaac, then and there had prepared ready to be executed by her, the said Emma Canady, nee Craig, was a petition for divorce, or some other paper the character of which is to the grand jurors unknown, which it was necessary for the said Emma Canady, nee Craig, to sign before she could procure a divorce from her husband, and by means of such false representations and pretenses aforesaid the said S. W. Isaac did then and there obtain the name and signature of the said Emma Canady, nee Craig, purporting to convey to the said S. W. Isaac the following described tracts of land, situated in the Creek Nation, Ind. Ter., in the Western District of the Indian Territory; The N. ½ of the N. E. ¼, and lot 6 of section 9, township 18 N., range 17 E., said deed purporting to have been executed on the 15th day of August, 1904, and the signature of said Emma Canady, nee Craig, thereto having been made by mark,

and purporting to have been witnessed by `R. P. Price and L. L. Lanigan, the said deed purporting to have been acknowledged on the said 15th day of August, 1904, before Lena L. Lanigan, a notary public, and said deed purporting to have been recorded at Wagoner, Ind. Ter., in Miscellaneous Record No. 4, p. 269, which said deed so signed by the said Emma Canady, nee Craig, was then and there by reason of said false representations and pretenses, which were relied· upon and believed by the said Emma Canady, nee Craig, delivered by said Emma Canady, nee Craig, to said S. W. Isaac, whereas, in truth and in fact, the said instrument so prepared and made ready for the signature of her, the said Emma Canady, nee Craig, was not a petition for divorce, or other paper which it was necessary for her to sign in order to obtain a divorce from her husband, as the said S. W. Isaac then and there well knew, and the said S. W. Isaac then and there well knew that the said representations and pretenses were false, and were then and there designedly made by him, the said S. W. Isaac, ·with the intent to defraud her, the said Emma Canady, nee Craig, as aforesaid, contrary to the form of the statute in such case made and provided, etc. On the 9th day of March, 1905, the defendant was arraigned, and entered a plea of not guilty, and his bond was fixed at $2,000. On the 7th day of March, 1906, this cause was by the court transferred to the United States Court for the Western District, sitting at Muskogee, Ind. Ter. On the 8th day of May, 1906, the case came on for trial before a jury, who on the 10th day of May, 1906; returned the following ·verdict: "We, the jury, duly impaneled and sworn in the above entitled action, do find from the law and the evidence the within named defendant, S. W. Isaac, guilty in manner and form as charged in the within indictment, and find the value of the property received by means of the false pretenses in the indictment alleged to be $720, and we fix the punishment at imprisonment for·the term of one year,

and a fine of $10. C. W. Willey, Foreman." On the 19th day of May, 1906, defendant files motion for new trial, and on the same day said motion, being heard by the court, was overruled, and the court sentenced the defendant to imprisonment in the United States penitentiary at Ft. Leavenworth, Kan., for the term of one year, to which judgment and sentence of the court defendant at the time excepted, and was given 30 days to file bill of exceptions, and the case was brought to this court by writ of error.

*De Roos Bailey* and *Thomas H. Owen*, for plaintiff in error.

*William M. Mellette*, U. S. Atty.

TOWNSEND, J. (after stating the facts as above). The plaintiff in error has filed eight specifications of error, as follows: "(1) The court erred in overruling appellant's motion for a new trial. (2) The court erred in rendering judgment on the verdict returned in court by the jury. (3) The court erred in admitting the following evidence of W. P. Skeen over the objection of appellant, to wit: 'Q. Well, on the third or last trip you made out there, did you have this talk to Ashwood? Didn't you say to him that Dr. Hamilton said if they, meaning Emma Canady, Celia McIntosh, and the old lady Rowe, didn't come down and make a deed to their land or turn it over to him, that he would send all of them to the penitentiary, or words to that effect? A. Yes, sir. Q. You had gone over, I believe you stated, on the solicitation of Dr. Hamilton? A. Yes, sir; I did.' (4) The court erred in not permitting appellant to read to the jury all of the affidavit made by the prosecuting witness, Emma Canady, on the 21st day of March, 1906; the court permitting that to be read only which preceded the jurat. (5) The court erred in instructing the jury over the objection of the appellant as follows, to wit: 'There has been introduced

in evidence here a paper, so-called affidavit, purporting to have been given by this prosecuting witness for the purpose of showing that she made contradictory statements, and you have the right to take into consideration that paper made by her, but nothing more. The mere fact that it has been sworn to by a notary public does not add or give strength, because it is not such a paper as the law requires should be sworn to, and, although it may be untrue, the person could not be found guilty of perjury for making statement of that kind, because it is not a paper which the law requires should be made under oath; but this paper may be considered by you in considering the weight of the prosecuting witness. And you may consider, also, that this paper was made with reference to the date of the return of this indictment. You have the opportunity of taking the indictment to your room. The indictment is shown to have been returned by the grand jury on March 8, 1905.' (6) Because the court erred in not stopping G. W. Robinson, Esq., who was assisting in the prosecution of the case, and who in closing the argument for the government used the following language: 'Gentlemen, from the facts and circumstances in this case, this woman has been pursued and followed by the sleuth hounds of Isaac and Dr. Hamilton ever since the indictment was returned against Isaac, trying to get her to make statements and affidavits that would defeat this prosecution. In fact, in my judgment, there has been one of the most systematic and damnable conspiracies on the part of Hamilton and Isaac to rob this poor, illiterate, and ignorant woman of her land that has ever been perpetrated in the Creek Nation, and my opinion is based on the facts and circumstances in the case.' (7) The court erred in examining the witness Emma Canady as follows: '(By the Court) Q. Is this Isaac a lawyer? A. Yes, sir. Q. Did he have a sign hanging out? A. Yes, sir; he had a sign on the street. Q. Where did he practice? A. I

don't know, somewheres down here in town. Q. How long had you known him? A. About two years, I guess, just by recommendation. I didn't know him personally. Q. How did you happen to come and employ him? A. This man Ashwood directed me to him. Q. Ashwood, he was your agent, acting for you, looking after your land? A. Yes, sir. I could have went to Wagoner and got me a lawyer— Q. Just answer the question. That is the way you happened to go to him? A. Yes, sir. Q. Did he get your divorce? A. No, sir. Q. Did you get another lawyer? A. Yes, sir, I got another lawyer.' (8) The court erred in cross-examining the witness Lena L. Lanigan, as follows, to wit: '(By the Court): Q. Did you personally know this woman whose acknowledgment you took? A. I never saw her until that day. I have seen her since then, but not before. Q. Did you ask her her name? A. Yes, sir. Q. You didn't personally know her? A. No, sir. Q. And you didn't know whether she was the person claimed to be or not? A. She said she was. Q. You accepted what she said? A. Yes, sir. Q. Did any one else tell you a thing about her to identify her? A. Lawyer Price told me who she was. Q. Didn't you certify that you personally knew her? A. I don't know what the character of the certificate is. Q. Might not you be deceived every day by some one coming in and claiming some one else's name without identifying themselves? A. She identified herself. Q. By whom? A. Lawyer Price said it was she, and she said it was her mark. Q. You didn't take any proof of her identity? A. I don't remember, sir. Q. You know the words, "Personally known to me to be the same person," and she wasn't personally known to you; that is a fact, isn't it? A. I only knew her that day. Q. It was because they told you: Price told you? A. And she said so herself. Q. And Isaac told you? A. No; he didn't say so. Q. You were in the habit of going in there

and taking a good many acknowledgments for this man Jacobs or Isaac? A. I don't know, sir. Q. You took acknowledgments for Simms, didn't you? A. I took acknowledgments for any one that came. Q. Is that the only record you have? A. I have another that is larger and the leaves doesn't come out, but it is the same record, a copy.'"

The third specification of error is the one first argued by the plaintiff in error. The contention of the plaintiff in error is that the witness W. B. Skeen could not be asked on cross-examination anything except as to facts and circumstances connected with the matters stated in the direct examination, and that, if the opposite party wishes to examine him on other matters, he must make the witness his own, and call him as such in the subsequent progress of the case. This is a fair statement, in our judgment, of the American rule upon the subject of the cross-examination of witnesses. The contention of the defendant in error is that the fact that the witness is directly interested in the event of the suit in which he is called to testify is a circumstance which the opposite party has a right to bring out on cross-examination, and he may ask the witness anything that will show his interest, or anything he has done in aid of the party for whom he testifies. In 30 American & Eng. Enc. Law, p. 1095, we find the following, which is sustained by authorities there cited: "The fact that a witness is directly interested in the event of the suit in which he is called to testify is a circumstance which the opposite party has the right to bring out on cross-examination, and he may ask the witness anything that will show his interest, and anything he has done in aid of the party for whom he. testifies." It appears that the witness Skeen had two or three times visited Ashwood, who seemed to have been the representative of the prosecuting witness and others interested in that property, and stated to him that Dr. Hamilton said if they didn't come down and make a deed to their land, or

turn it over to him, that he would send all of them to the peni-
tentiary, or words to that effect. He claims not to be interested
in the case at all, and yet seems to take sufficient interest to
convey this information to Ashwood, evidently for the purpose
of bringing pressure to bear upon these women to secure a
conveyance for Hamilton, and when asked, "What did you
do it for?" replied, "Because Dr. Hamilton wanted me to.
He wanted me to get a deed and settle it up. I told him what
he told me, and I thought that was about as good a thing as
she could get at that time." This indicates clearly that the
witness Skeen had an interest in the matter of some kind,
and the court evidently believed that the jury should have the
knowledge of that fact, in order that they might determine
what credence to give to his testimony. In Wilson vs United
States, 5 Ind. Ter. 610, 82 S. W. 924, the court said: "We
think the extent of the cross-examination was within the
sound discretion of the trial judge, and his ruling will not be
disturbed, unless it clearly appears that a gross denial of the
rights of the appellant is apparent. It does not so appear
from the record in this case." And the comment contained
in the last sentence above quoted will apply with equal force
in the case at bar.

The next contention of the plaintiff in error is a con-
sideration of specifications of error 7 and 8, which are dis-
cussed together. Plaintiff in error suggests, without further
comment, that this case comes within the rule laid down by
the United States Court of Appeals for the Eighth Circuit in
the case of John Glover vs U. S., 147 Fed. 426, 77 C. C. A.
450. In the Glover Case the Court of Appeals of the Indian
Territory (91 S. W. 41) had affirmed the decision of the trial
court. The principal question involved was as to the cred-
ibility of witnesses, and the Court of Appeals of the Indian
Territory quoted from 30 American & Eng. Enc. of Law, pp.
1063-1066, as follows: "Province of Jury or Other Triers of

Facts. The credibility of witnesses, the effect and weight to be given conflicting and contradictory oral evidence, are all questions of fact, to be determined by the triers of the facts, whether court or jury, and not questions of law for the court.     *     *     *     If there is one question more peculiarly and exclusively within the province of the jury than any other, it is that of the credibility of witnesses. The right or duty to decide this question must never be divided between the court and the jury, and much less taken away from the jury and decided wholly by the court. It is ordinarily for the triers of the facts to determine whether and to what extent witnesses shall be believed, not only when there is a conflict of evidence merely, but also when the credibility of witnesses has been substantially impeached or discredited by evidence of bias, bad character, contradictory statements or the like, and this is true, though the witnesses of the adverse party have not been thus attacked.     *     *     *     Since the probative value of the testimony of witnesses depends on the credit to which the jury thinks it entitled, it necessarily follows that the court has no right to lay down for the jury rules whereby they shall determine the force of the evidence, irrespective of the credence they actually give it in their own minds." In the Circuit Court of Appeals the judgment of the trial court and of the Court of Appeals of the Indian Territory were reversed, and, so far as that reversal is material to the case at bar the syllabus states the following: "Where, in a prosecution for robbery, a witness had testified positively in support of defendant's alibi as to the place where he saw defendant on or about the time of the alleged robbery, it was improper for the court to catechise the witness at length as to whether he was absolutely sure that the defendant was at the place stated, and to tell the witness that if he was mistaken he could correct his statement, and to ask him to think and see whether or not he was not mistaken, and to correct his testimony if there was any doubt in his mind concerning his testimony."

Judge Phillips, in delivering the opinion of the court, said: "A striking illustration of the character of the discrepancies relied upon by the prosecution is found in the incident of leaving the house of the defendant's mother-in-law for the schoolhouse to attend a neighborhood gathering; the departure and trip being claimed by the defendant to have been concurrent in time with the alleged robbery. One witness for instance testified that the defendant, with others, rode in a wagon, while he and another stated that he walked. That such a wagon did so go is not controverted. How easy was it for a witness who saw the wagon leaving with a number of people in it at the time the defendant started to have received the impression that he was also in the wagon, there being nothing especially to direct the attention to the particular fact. Again, one witness, on cross-examination, testified as to what kind and variety of things the party had for breakfast before starting on the trip, while another testified to a different menu. As it does not appear that any of them were epicures, the quality and quantity of eatables on the particular occasion, which was not a feast, naturally enough would not have been definitely carried for a long period of time in their memory. So in respect of exactly how many people and who they were at this house the day before. Likewise was it rather smart than fair to press some of these witnesses on cross-examination as to where they were and what they did on some other specified day of the same month, in disregard of the absolute reasonableness why a day like the closing scene of a school term, when the neighbors with their baskets of delectable viands assembled and made it a festal event, would be fixed in their minds. On such trivialities of claimed divergences in testimony was the evidence of six witnesses in favor of the defendant discredited, while on the testimony of one witness, a self-confessed perjurer, was the defendant convicted and sentenced to serve six years in a penitentiary. To further illustrate the spirit of dealing

with the defendant's witnesses, when the witness Solomon was on the stand, who had testified very positively as to the place where he saw the defendant on or about the time of the alleged robbery, and whose testimony, if unimpeached, was of the highest value to the defendant, the court, as if to break the force of his testimony, took the witness in hand and catechised him as follows: 'Solomon, the court asks you whether you are absolutely sure and certain that this defendant was there at the school celebration on the 27th. If you are mistaken, you can correct your statement yet, but, if you are absolutely certain, say so, but think a moment and see whether or not you are mistaken about it. If you are mistaken correct your statement; if you are not, why just say it out. Perhaps you might be mistaken, the court doesn't know, but the court wants to have you remember everything properly and truthfully, and, if there is any doubt in your mind, make your correction. If there is any doubt in your mind that this defendant was not there—men sometimes are mistaken—just think about it and deliberate about it, and correct your statement if you are mistaken.' This bears on its face its own comment." In our judgment specifications of error 7 and 8 do not come within the rule that is so severely criticised by Judge Phillips. Therefore we do not think said assignments are well taken.

Plaintiff in error next considers specifications of error 4 and 5 together. No. 4 is the alleged error of the court in not permitting the plaintiff in error to read the entire affidavit made by the prosecuting witness, Emma Canady, on the 21st day of March, 1906, the court permitting to be read only that portion which preceded the jurat; and the fifth specification of error is his charge to the jury in relation to the same matter. We cannot concur in the view taken by counsel for plaintiff in error. The court in his instructions to the jury simply said that the paper presented was not one upon which any one could be convicted of perjury, and that the mere fact

that it has been sworn to before a notary public does not add or give strength, because it is not such a paper as the law requires should be sworn to. Although it may be untrue, a person could not be found guilty of perjury for making a statement of that kind, because it is not a statement which the law requires should be under oath; but the paper may be considered by the jury in considering the weight to be given the testimony of the prosecuting witness, and they may consider, also, the date the paper was made with reference to the date of the return of the indictment. It thus appears that the court was simply explaining and commenting upon the questions of fact presented, and then after making his comments, and telling them that the fact that it had been sworn to added nothing to the strength of it, he submitted the paper, with his explanations, to the jury, for their determination. This brings it within the rule laid down in the case of the United States vs P. & R. R. R. Co., 123 U. S. 113, 8 Sup. Ct. 77, 31 L. Ed. 138, cited by plaintiff in error. Plaintiff in error cites Lovejoy vs United States, 128 U. S. 171, 9 Sup. Ct. 57, 32 L. Ed. 389, which says: "It is established by repeated decisions that a court of the United States, in submitting a case to the jury, may at its discretion express its opinion upon the facts, and that such an opinion is not reversible on error, so long as no rule of law is incorrectly stated, and all matters of fact are ultimately submitted to the determination of the jury." We think the court was clearly within the rule specified in those decisions. Section 5392 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3653], which is in force in this jurisdiction, provides in what perjury shall consist, and is as follows: "Every person, who, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition,

or certificate by him subscribed is true, willfully and contrary to such oath states or subscribes any material matter, which he does not believe to be true, is guilty of perjury, and shall be punished by a fine of not more than two thousand dollars, and by imprisonment, at hard labor, not more than five years; and shall, moreover, thereafter be incapable of giving testimony in any court of the United States until such time as the judgment against him is reversed." The court, in explaining and commenting upon the paper presented, was simply informing the jury what the law was, and in our judgment it would have been highly improper for him to have permitted the paper to have gone to the jury with the impression that in signing the paper and swearing to it before a notary public, she had committed perjury. Therefore we are of the opinion that the fourth and fifth assignments are not well taken.

Under the fourth proposition, he discusses the sixth assignment of error. It appears from the record that the remarks made by Mr. Robinson, the assistant prosecutor, expressly states that he is commenting upon the facts and circumstances developed on the trial of the case, and, as long as he commented on the facts and circumstances of the case, he was clearly within the law. The fact is disclosed by the record that the defendant, after securing the deed to the land in question, within a very few days conveyed the same to Hamilton, when according to the defendant's first contention he was employed to have the lease of Hamilton for 25 years canceled, which lease, as a lawyer, he knew, or should have known, was absolutely void. The facts and circumstances disclosed by the record would strongly indicate that there was an understanding between the defendant and Hamilton in procuring the deed from this woman, and that they were acting together in this matter. It is perfectly evident that this prosecuting witness was an exceedingly illiterate and ignorant woman, and we do not think it would be an unjust

comment to say, from this record, that she had fallen among thieves.

From a full consideration of the record in this case, and a careful consideration of the specifications of error presented by the plaintiff in error, it is our judgment that the plaintiff in error, had a fair trial, and the judgment of the court below is affirmed.

GILL, C. J., and CLAYTON, J., concur.